**UNITED STATES of America, Plaintiff,**

v.

**Elwood Lowell DIERCKS, Defendant.**

**Cr. No. 18031.**

United States District Court
E. D. Illinois.

Sept. 29, 1954.

John Morton Jones, Asst. U. S. Atty., Clifford M. Raemer, U. S. Atty., Danville, Ill., for plaintiff.

Victor F. Schmidt, Columbus, Ohio, for defendant.

PLATT, District Judge.

Elwood Lowell Diercks was indicted by the grand jury on two counts alleging that he violated Section 462, Title 50 U.S.C.A.Appendix, in that he refused to perform the work at Manteno State Hospital, at Manteno, Illinois, in accordance with the order of his Selective Service Board.

The petitioner and the government stipulated in writing that a jury be waived. Rule 23(a) Fed.Rules Crim. Proc., 18 U.S.C.A.; that the selective service system file be admitted in evidence, and that the defendant Diercks failed to perform work as charged in the indictment.

The defendant contends that he is not guilty for the following reasons:

1. He was arbitrarily denied a minister's classification.

2. He was denied a fair hearing on January 24, 1952.

3. The physical examination was illegal and destroyed jurisdiction of the board for the reasons:

(a) He was ordered to report for physical examination while his case was on appeal, and

(b) His physical examination did not take into consideration the letter from his personal physician.

4. The imposition of work in the State Hospital not under control of the federal government is in violation of the Thirteenth Amendment to the Constitution of the United States.

The facts as disclosed by the file of Mr. Diercks before the board were as follows:

His first questionnaire was filed with the board October 12, 1948. Mr. Diercks stated he was born April 4, 1927. He was a minister of Jehovah's Witnesses in regular service since 1945, having been ordained on that day. His occupation was part time general farm work for the past four years at a weekly pay of $35.00 for an average of 40 hours work per week. He was responsible for the operation of the farm which was owned by his father. 35 acres of corn, 15 acres of hay and 22 acres of oats were planted on the farm and it was stocked with 800 fox, 20 pigs and 15 cows. He stated he was conscientiously opposed to participation in war in any form and he was physically disabled with "Metabolic Disterbance." He requested a 4–D (Ministerial Exemption) or a 4–F (Physically unfit). With the questionnaire, he filed affidavits from several persons that he preached from house to house and lectured. His father also filed an affidavit alleging his son devoted on the average of 20 hours per month at field service work and 25 hours per month to study by himself, and he was enrolled in the Ministry School conducted at Kingdom Hall (Church of Jehovah's Witnesses). The draft board on December 29, 1948 classified Mr. Diercks 1–A.

Mr. Diercks completed his form No. 150 (special form for conscientious objector) April 25, 1949, in which he noted he worked as a farm hand and insurance salesman for his father. He became a member of Jehovah's Witnesses April 29, 1949. On April 26, 1949, Mr. Diercks was classified 4–E (conscientious objector).[1] December 18, 1940, Mr. Diercks was reclassified 1–A–O, which made him subject to noncombatant military service.

The defendant requested a hearing before the board, and at the hearing stated that he preached a little every Sunday and also during the week, and he had a job on the farm with his father. The board again on January 11, 1951, classified the defendant 4–E.

There is no further notation until December 18, 1951, when the board reviewed the file and changed his classification to 1–O (Available for civilian work contributing to the maintenance of national health, safety, or interest.) Immediately the defendant objected to this classification claiming a ministerial exemption.

Another personal appearance was given Mr. Diercks by the board on January 24, 1952. On the board's summary there is a statement, Mr. Diercks preached every day and he had given sermons of an hour and half in length on different subjects in the Bible for the past six Sundays. As he received no pay for preaching, he was in the insurance business with his father at Algonquin, Illinois, where he made his money. The board informed Mr. Diercks that they considered his Ministry work an avocation. On January 24, 1952, he was classified 1–O, (Conscientious Objector).

By letter, an appeal was requested from this classification. Mr. Diercks asserted his ministerial duties and enclosed a certificate which authorized him to act as a duly ordained minister of Jehovah's Witnesses. The appeal board on September 11, 1952 affirmed the local board's classification of 1–O.

While the appeal was pending, Mr. Diercks was ordered to appear before the Chicago Armed Services Examining Station on July 15, 1952. In his medical history before the board, he reported

---

1. Former regulation 1622.3. Conscientiously opposed to both combatant and noncombatant military service.

that he had two jobs in the past three years, and the longest period that he held any of these jobs was "84 months," but his usual occupation was a minister. He was given his physical examination on July 15, 1952, and was reported acceptable for induction July 24, 1952. The Selective Service Board on July 18, 1952, received a medical report from Dr. Maximilian Kern, of Chicago, Illinois, the personal physician of Mr. Diercks, but it was not sent to the examining station until February 12, 1953. After receiving this report the examining board reported back to the local board that he was physicially fit for induction.

Another letter was written by Mr. Diercks on October 7, 1952, stating that he was regularly teaching and preaching the principles of religion as embodied in the creed or principles of the church known as Jehovah's Witnesses. He also enclosed with the letter a document entitled "Pioneer Appointment." [2]

A special report for Class 1-O registrants was returned by Mr. Diercks to the local board on October 14, 1952. As employers he listed: (1) the Watchtower Bible and Tract Society, describing his occupation as a minister. (2) A. E. Diercks, describing his job as follows: "I have helped out *part* time on my father's farm and in his insurance business." He failed to answer when the latter work started or ended.

The local board was in doubt as to the correctness of its classification and wrote the Illinois State Headquarters requesting an opinion as to whether it was mandatory to give Mr. Diercks a 4-D exemption, as a minister, on the basis of his Pioneer Appointment. The board received a reply that it was not mandatory unless in the opinion of the local board the registrant was so qualified.

Two more letters dated December 4, 1952 and December 8, 1952 were written by Mr. Diercks to the board. The information in his letter of December 8 stated he devoted forty to sixty hours per week in preaching, and that any other work in which he was engaged in to sustain him was relatively unimportant, and that he did not permit it to interfere with his regular ministry work. He further noted that he had been assigned by the Watchtower Bible & Tract Society to do evangelistic house-to-house missionary work in a territory about twenty miles long and fifteen miles wide. The board considered the letters and refused to reopen his classification or to grant another hearing. Mr. Diercks met with the local board to discuss his civilian work assigned February 12, 1953. He reiterated his calling was to serve God. He stated "Jehovah's Witnesses are being classified 4-D all over the country and I see no reason why I should not be classified 4-D." On February 23, 1953, Mr. Diercks wrote the board that he was devoting his life to ministry. March 23, 1953, the board mailed Mr. Diercks his induction order to report at the Manteno State Hospital April 2, 1953.

The first question presented is whether there is any basis in the facts which would justify or support the denial of the 4-D or ministerial classification by the selective service board. In the first questionnaire Mr. Diercks stated that he worked 40 hours per week at secular work. He termed this "part time." He always claimed his vocation was a minister, and while he insisted upon this in hearings before the board and in his letters to the board, he at no time advised that he had decreased his secular work. It was the duty of the board to determine not only that Mr.

<hr>

2. The Pioneer Appointment is a form letter on Watchtower Bible and Tract Society letterhead, with Mr. Diercks' name inserted thereon by what appears to be an addressograph plate. This paper states in substance that Diercks is now a full time minister, and that the pioneer service is now his vocation. It adds that he is required to serve in the field a minimum of 100 hours a month. The paper then describes special literature rates, report cards, and, in general, other factors relating to pioneer service.

Diercks was a "'regular or duly ordained minister of religion'" but also that his vocation was to "teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church".[3] The board was justified in assuming that his employment of 40 hours a week in secular work continued. It is true on December 8, 1952, Mr. Diercks by letter informed the board that he devoted forty-to-sixty hours per week to preaching, and he did not let the secular work interfere with his regular ministry work. This still leaves in his file the uncontradicted statement that his "part time" secular work was 40 hours per week. It is not the duty of this court to reclassify Mr. Diercks, but merely to determine whether there was a basis upon which the board was justified in denying the 4–D classification. Our 7th Circuit, on June 15, 1954, in United States v. Simmons, 213 F.2d 901, at page 903 stated:

"[T]he burden is on the claimant to prove himself to be within the group entitled to claim the privilege. The court reviewing an order denying such a claim of privilege may not weigh the evidence. The selective service file may be scrutinized only for the narrow purpose of determining whether any factual basis supports the classification, and in its scrutiny the reviewing court may not require adherence by the administrative body to the niceties of judicial rules of evidence. When and if the court determines that the contested order rests on a basis in fact, its jurisdiction ends, even though the court be convinced that the order is erroneous."

In Dickinson v. United States, 346 U.S. 389, the registrant clearly detailed the change in status of his secular work. Mr. Diercks clearly failed to do this. The board had a factual basis to deny the 4–D classification. See, United States v.

Koch, D.C., 119 F.Supp. 650; United States v. Schuemann, D.C., 119 F.Supp. 640; Neal v. United States, 5 Cir., 203 F. 2d 111.

██ There is no merit to the defendant's second contention that he was not given a fair hearing on January 24, 1952. At the trial Mr. Diercks testified he was not permitted to quote from the Bible, but he gave no material and reliable facts which would change his status. The summary was in question and answer form and contained all the relevant facts. It is not required to be a judicial transcript of everything said before the board. It is sufficient if the file contains all the substantial facts bearing on defendant's status. United States v. Mansavage, 7 Cir., 178 F.2d 812. His last statement in this summary was: "I was glad to have the opportunity of speaking before you as I wanted to state my point." It was evident that Mr. Diercks was satisfied with the hearing at that time. The summary certainly refutes defendant's objection he was not given time at the hearing.

██ The third contention of Mr. Diercks, claiming his physical examination was illegal and destroyed jurisdiction of the board, is of no avail. There is nothing in the regulation which states when he should be examined. The regulations[4] expressly provide that the local board shall comply with the directive of the State Director and shall mail to the registrant an order to report for physical examination without regard to whether appeal of classification has been or will be taken. The letter of his personal Doctor to the selective service board did not reach the examining board in time to have consideration at the time he was physically examined. However, the local board did forward the letter in February of 1953, and the examining board replied that it did not change his status. He was given a complete physical examination by the examining board and there is nothing in the file to indicate anything

---

3. 50 U.S.C.A.Appendix, § 466(g) (1), (2), and (3).

4. Sec. 1628.11 of Selective Service Regulations.

improper in his physical examination. Nothing in the regulations require the examining board to consider letters from personal physicians.

 Mr. Diercks has also contended that the assignment of work at Manteno State Hospital was in violation of the Thirteenth Amendment. This was discussed in the case of United States v. Smith, D.C., 124 F.Supp. 406, and the court concluded the civilian work contributed to the national health, and was within the constitutional limitations.

It must be concluded the defendant is guilty as charged.